*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CRESTWOOD HOMEOWNERS ASSOCIATION, INC.,

UNPUBLISHED
September 29, 2022

Plaintiff-Appellant,

v

No. 359070
Otsego Circuit Court
LC No. 21-018475-CH

KATHLEEN PAWLANTA,

Defendant-Appellee.

Before: M. J. KELLY, P.J., and CAMERON and HOOD, JJ.

PER CURIAM.

In this case involving a restrictive covenant, plaintiff, Crestwood Homeowners Association, Inc., appeals as of right the trial court's order granting summary disposition in favor of defendant, Kathleen Pawlanta. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

Pawlanta owns a lot within the Crest Wood Manor subdivision #2 that is subject to a restrictive covenant that runs with the land. Relevant to this appeal, Article III, paragraph 2 of the restrictive covenant provides:

> No building or other structure shall be erected or altered or permitted on any site in the Plat of Crest Wood Manor #2 and Crest Wood Manor #3 other than one single family dwelling house with attached garage; except swimming pool, tennis court, badminton court, walls or fences and such other auxiliary construction.

Pawlanta built a "storage barn" measuring 10' x 14' on her lot so that she could store her "snowthrower and other winter items." After learning of the structure, the Association sent Pawlanta two letters demanding removal of the shed because it violated the restrictive covenant's prohibition on structures other than single-family residences. Pawlanta refused to remove the shed.

The Association filed a complaint requesting that the trial court order that Pawlanta remove the shed from her property and enjoin her from placing another shed on the property in the future.

-1-

The complaint alleged that all "outbuildings," including sheds, barns, and storage containers, other than attached garages, were prohibited in the subdivision, and therefore, Pawlanta's shed violated the subdivision's restrictive covenant.

In August 2021, the Association filed a motion for summary disposition under MCR 2.116(C)(9) and (C)(10). It asserted that the restrictive covenant was legal, that it had not waived enforcement of the restriction, and there were no genuine issues of material fact. Pawlanta argued in response that the restrictive covenant was vague and did not define the term "auxiliary construction." As a result, Pawlanta contended that the restrictive covenant was ambiguous and unenforceable. Alternatively, she also argued that the Association waived enforcement of the restrictive covenant by failing to enforce prior violations.

Following a hearing, the trial court entered an order denying the Association's motion for summary disposition under MCR 2.116(C)(10)[1] and granting summary disposition to Pawlanta under MCR 2.116(I)(2). The court found that the phrase "auxiliary construction" was ambiguous, so the restriction was unenforceable. Alternatively, the court found that the Association had waived enforcement. This appeal follows.

## II. SUMMARY DISPOSITION

## A. STANDARD OF REVIEW

The Association argues that the trial court erred by denying its motion for summary disposition and granting summary disposition to Pawlanta. We review de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). Likewise, "[t]he interpretation of restrictive covenants is a question of law that this Court reviews de novo." *Eager v Peasley*, 322 Mich App 174, 179; 911 NW2d 470 (2017) (quotation marks and citation omitted).

## B. ANALYSIS

A restrictive covenant is a contract between a buyer and seller of property that allows landowners to preserve a desired aesthetic "or other characteristics in a neighborhood, which the parties may consider valuable for raising a family, conserving monetary value, or other reasons particular to the parties." *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 212, 214; 737 NW2d 670 (2007). "Restrictive covenants involve two fundamental freedoms—the freedom to contract and the freedom to use property." *Mazzola v Deeplands Dev Co LLC*, 329 Mich App 216, 223-224; 942 NW2d 107 (2019). The failure to enforce a deed restriction may deprive a landowner of their property rights whereas enforcing a deed restriction beyond the restrictor's intent may deprive a landowner of their legal right to use their own property. *Thiel v Goyings*, 504 Mich 484, 496; 939 NW2d 152 (2019).

---

[1] The court partially granted the Association's motion for summary disposition under MCR 2.116(C)(9). That portion of the court's order has not been challenged on appeal.

As noted above, Pawlanta's property is subject to the following restrictive covenant:

> No building or other structure shall be erected or altered or permitted on any site in the Plat of Crest Wood Manor #2 and Crest Wood Manor #3 other than one single family dwelling house with attached garage; except swimming pool, tennis court, badminton court, walls or fences and such other auxiliary construction.

On appeal, the Association first argues that the trial court erred by determining that the phrase "auxiliary construction" was ambiguous. We agree that the language is unambiguous. However, we disagree with the Association's contention that Pawlanta's storage shed is not an auxiliary construction permitted under the plain and unambiguous language of the restrictive covenant.

Unambiguous restrictive covenants "must be enforced as written." *Johnson Family Ltd Partnership v White Pines Wireless, LLC*, 281 Mich App 364, 389; 761 NW2d 353 (2008). A contract is ambiguous if its language may be reasonably understood in two or more different ways. *Edmore v Crystal Automation Sys Inc*, 322 Mich App 244, 262; 911 NW2d 241 (2017). "[T]he language employed in stating the restriction is to be taken in its ordinary and generally understood or popular sense, and is not to be subjected to technical refinement, nor the words torn from their association and their separate meanings sought in a lexicon." *Eager*, 322 Mich App at 180-181 (quotation marks and citation omitted). See also *Terrien v Zwit*, 467 Mich 56, 75-76; 648 NW2d 602 (2002) (stating that a term that is not defined in a contract will be interpreted "in accordance with its commonly used meaning."). "[A]ny uncertainty or doubt must be resolved in favor of the free use of property." *Thiel*, 504 Mich at 497.

The term "auxiliary construction" is not defined by the restrictive covenant. The fact that a term is undefined does not render the contract ambiguous. *Terrien*, 467 Mich at 76. Instead, this Court may consult a dictionary to determine the common meaning of a phrase in a restrictive covenant. See *id*. at 63-64. "Auxiliary" means "offering or providing help" or "functioning in a subsidiary capacity." *Merriam-Webster's Collegiate Dictionary* (11th ed). See also *Black's Law Dictionary* (7th ed) (defining "auxiliary" as "[a]iding or supporting" and "subsidiary"). "Construction" is defined as "[t]he act of building by combining or arranging parts or elements," and "the thing so built." *Black's Law Dictionary* (7th ed). Thus, as a result, the phrase "auxiliary construction," as used in the restrictive covenant, is commonly understood to refer to a structure built to function in a subsidiary capacity or to aid or support a single-family residence. Stated differently, an auxiliary construction is one that complements and supplements a single-family home.

The interpretation is further supported by the interpretive cannon *ejusdem generis*. Under that doctrine, when "general words follow a designation of particular subjects the meaning of the general words will ordinarily be presumed to be and construed as restricted by the particular designation and as including only things of the same kind, class, character or nature as those specifically enumerated." *Rott v Rott*, 508 Mich 274, 299 n 11; 972 NW2d 789 (2021). Here, although the primary focus is on the term "auxiliary construction," the restrictive covenant actually states "such other auxiliary construction." Thus, it specifically directs that the phrase be interpreted in connection with the constructions that are expressly permitted.

The expressly permitted constructions are swimming pools, tennis courts, badminton courts, fences, and walls. The Association notes that that each of the listed constructions complement and supplement a single-family home and that they typically do no exist in isolation from a single-family residence. They also assert that the following structures—which have been constructed in the subdivision—fall within the definition of an "auxiliary construction:" dog kennels, children's playhouses, unenclosed/partially enclosed structures used to store firewood, and structure's attached to the single-family residence. We agree that the listed structures—and the structures that the Association has treated as conforming to the restrictive covenant—support and complement a single-family home. Yet, it is clear that a storage shed used to store equipment—such as a "snowthrower" and other winter gear—is also a structure that complements and supplements a single-family home. Moreover, a shed used to store equipment used to maintain a single-family home typically does not exist in isolation from a single-family home. Thus, under the plain language interpretation of the relevant language, a storage shed used to complement and supplement a single-family home is an auxiliary structure.

The Association posits that a shed is nevertheless impermissible because it could be used for a commercial purpose. That argument is unavailing and has no basis in the language used in the restrictive covenant. Dog kennels, children's playhouses, storage structures for wood, and structures attached to the side of a person's home may also be used for residential purposes or for commercial purposes. Similarly, swimming pools, tennis courts, and badminton courts may also be used for commercial purposes. Although there is nothing in the record suggesting that the structures of that nature existing within the subdivision are, in fact, being used for commercial purposes, there is also no evidence indicating that Pawlanta is using—or is even planning on using—her storage shed for commercial purposes. Instead, she has averred that the purpose is to store a "snowthrower" and other winter equipment that, likely, will be used to maintain the property during winter. More importantly, a shed (or other structure) used for commercial purposes is not prohibited because it is a shed (or other structure). Rather, it is prohibited under Article III, paragraph 1, if it is used for commercial purposes rather than for residential purposes. The Association's concerns regarding the hypothetical use of a storage shed for commercial purposes, therefore, are irrelevant to the interpretation of the phrase "auxiliary construction."

The Association also directs this Court to the results of an earlier enforcement action. Specifically, in 1994 the Association took enforcement action against homeowners who attempted to erect a shed on their property. In a written opinion granting the Association relief, the circuit court judge concluded that sheds were not permitted because—unlike swimming pools, tennis courts, and badminton courts—sheds are enclosed structures. We do not find that interpretation of the restrictive covenant to be persuasive. Although swimming pools, tennis courts, and badminton courts can be unenclosed, they may also be built as part of an enclosed structure. The deed language does not provide that the structures built to complement and support a single-family residence must be unenclosed.

Finally, the Association notes, repeatedly, that Pawlanta's shed is large enough to accommodate parking a vehicle inside. Under the plain language of the restrictive covenant, only attached garages are permitted. Pawlanta is not using the shed as a garage, however. If, in the future, she were to convert the shed from a storage structure used to complement and support her single-family home into a detached garage, then, there would be a basis to take enforcement action against her. The mere fact that such a conversion is possible, however, is not dispositive. Indeed,

there are no size restrictions imposed on the permissible auxiliary constructions. As a result, it does not matter that the shed is tall enough for an "average adult" to stand inside and wide enough for a motor-vehicle to be parked inside.

In conclusion, the phrase "auxiliary construction" unambiguously refers to a structure that is built to aid, support, complement, and supplement a single-family home. The shed at issue was built to store items used to aid, support, complement, and supplement Pawlanta's single-family home, it is a permissible structure. Thus, although the court erred by finding that the restrictive covenant was ambiguous, it reached the right result by granting summary disposition to Pawlanta. See *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.").[2]

Affirmed. Pawlanta may tax costs as the prevailing party. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Noah P. Hood

---

[2] Given our resolution, we need not address whether the Association waived enforcement of the restrictive covenant.